No. 25-3320

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE EIGHTH CIRCUIT

---

DESMOND BANKS, individually and on behalf of a class of similarly situated individuals,

*Plaintiff–Appellant*,

v.

COSTAR REALTY INFORMATION, INC., a Delaware corporation,

*Defendant–Appellee.*

---

On Appeal from the United States District Court
For the Eastern District of Missouri, No. 4:25-cv-00564-CMS
The Honorable Cristian M. Stevens

---

**Response Brief for Appellee CoStar Realty Information, Inc.**

---

RICHARD B. RAILE
BAKER & HOSTETLER LLP
1050 Connecticut Ave., N.W.
  Suite 1100
Washington, D.C. 20036
(202) 861-1711
rraile@bakerlaw.com

BONNIE KEANE DELGOBBO
JOEL C. GRISWOLD
BAKER & HOSTETLER LLP
One North Wacker Dr.
  Suite 4500
Chicago, IL 60606
(312) 416-6200
bdelgobbo@bakerlaw.com
jcgriswold@bakerlaw.com

# SUMMARY OF THE CASE AND
# STATEMENT ON ORAL ARGUMENT

The district court dismissed Plaintiff Desmond Banks's single claim under the Video Privacy Protection Act (the Act) against Defendant CoStar Realty Information, Inc. (CoStar) on multiple independently sufficient grounds. It held that CoStar is not a regulated "video tape service provider" because its apartment-listing website does not deliver video cassette tapes or similar physical items and, in any event, is not a video delivery business. The court held that Plaintiff is not a protected "consumer" under the Act because he does not allege a subscription that entitled him to relevant goods or services. And the court held that Plaintiff does not allege he was subject to a disclosure of "personally identifiable information" because his complaint alleged no meaningful factual content concerning the information disclosed. On these and other grounds, the court's judgment stands unimpeachable.

CoStar does not view the questions presented as difficult—especially given that the Court can affirm on any of the independent grounds, however narrow—and takes no position whether the Court should entertain oral argument.

# CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and Eighth Circuit Rule 26.1A, Defendant-Appellee CoStar Realty Information, Inc. hereby states that it is a wholly owned subsidiary of its parent company CoStar Group Inc., which is publicly traded on the NASDAQ exchange.

Dated: April 29, 2026                      */s/ Bonnie Keane DelGobbo*
                                           Bonnie Keane DelGobbo

# TABLE OF CONTENTS

SUMMARY OF THE CASE AND
STATEMENT ON ORAL ARGUMENT ........................................................i

CORPORATE DISCLOSURE STATEMENT..............................................ii

TABLE OF CONTENTS ........................................................................iii

TABLE OF AUTHORITIES ....................................................................v

STATEMENT........................................................................................1

STATEMENT OF JURISDICTION..........................................................2

STATEMENT OF ISSUES......................................................................3

STATEMENT OF THE CASE..................................................................5

   A. Background ..................................................................................5

   B. The Present Controversy ...............................................................9

SUMMARY OF THE ARGUMENT........................................................13

STANDARD OF REVIEW ...................................................................15

ARGUMENT ......................................................................................16

   I.    CoStar Is Not a Video Tape Service Provider..............................16

      A. Video Content Posted on CoStar's Website Is Not a
         Video Cassette Tape or Similar Item ........................................16

      B. CoStar Is Not a Video Delivery Service ...................................25

   II.   Plaintiff Is Not a Consumer ......................................................29

      A. The Complaint Does Not Allege A Subscription "of" Goods or
         Services "from" CoStar ...........................................................30

      B. The Complaint Alleges No Commitment Necessary to a
         Subscriber Relationship............................................................31

C. The Complaint Does Not Allege a Subscription for an Audio Visual Good or Service ................................................... 32

III. No Disclosure of Personally Identifiable Information Occurred ...... 36

A. The Complaint Does Not Allege a Disclosure ........................... 36

B. The Type of Disclosure Hypothesized Does Not Identify a Person to Any Person in a Manner Any Person Could Understand ....................................................... 39

IV. Plaintiff Has No Basis to Seek Leave to Amend ............................. 43

CONCLUSION................................................................................ 45

# TABLE OF AUTHORITIES

## Cases

*Abramski v. United States*,
  573 U.S. 169 (2014) ................................................................................ 8

*Allan v. Minn. Dep't of Hum. Servs.*,
  127 F.4th 717 (8th Cir.) (citation omitted),
  *cert. denied*, 146 S. Ct. 94 (2025) ............................................................ 37

*Ambrose v. Bos. Globe Media Partners LLC*,
  No. 21-cv-10810, 2022 WL 4329373 (D. Mass. Sept. 19, 2022)................ 28

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) .............................................................................. 15

*Avila v. Bondi*,
  170 F.4th 1128 (8th Cir. 2026) ............................................................... 19

*Barr v. Am. Ass'n of Pol. Consultants, Inc.*,
  591 U.S. 610 (2020) ..........................................................................23, 24

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007) ..................................................................... 15, 37, 38

*Biden v. Nebraska*,
  600 U.S. 477 (2023) .............................................................................. 23

*Campbell v. Transgenomic, Inc.*,
  916 F.3d 1121 (8th Cir. 2019)................................................................... 9

*Central Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of New York*,
  447 U.S. 557 (1980) .............................................................................. 24

*Christopherson v. Cinema Ent. Corp.*,
  161 F.4th 525 (8th Cir. 2025) ....................... 3, 16, 17, 20, 22, 26, 28, 29, 38

*City of Ladue v. Gilleo*,
  512 U.S. 43 (1994)................................................................................. 24

*Clark v. Martinez*,
  543 U.S. 371 (2005) .............................................................................. 25

*Clinton v. City of New York*,
  524 U.S. 417 (1998) ..................................................................... 21

*Collins v. Toledo Blade*,
  720 F. Supp. 3d 543 (N.D. Ohio 2024) .................................. 28

*Colson v. Hennepin County*,
  169 F.4th 773 (8th Cir. 2026) .......................................... 3, 30

*Delaware v. Pennsylvania*,
  598 U.S. 115 (2023) ..................................................................... 17

*Dorothy J. v. Little Rock Sch. Dist.*,
  7 F.3d 729 (8th Cir. 1993) ................................................ 27, 31

*DRE Health Corp. v. BRM Trades, LLC*,
  151 F.4th 957 (8th Cir. 2025) ................................................... 3

*Drobnak v. Andersen Corp.*,
  561 F.3d 778 (8th Cir. 2009) .............................................. 4, 44

*Dubin v. United States*,
  599 U.S. 110 (2023) ..................................................................... 34

*Ebert v. Poston*,
  266 U.S. 548 (1925) ..................................................................... 22

*Eichenberger v. ESPN, Inc.*,
  876 F.3d 979 (9th Cir. 2017) ................................. 4, 20, 40, 41

*Ellis v. Cartoon Network, Inc.*,
  803 F.3d 1251 (11th Cir. 2015) ......................................... 3, 31

*Fla. Bar v. Went For It, Inc.*,
  515 U.S. 618 (1995) ..................................................................... 24

*FTC v. Credit Bureau Ctr., LLC*,
  937 F.3d 764 (7th Cir. 2019) .................................................. 18

*Gardner v. Me-TV Nat'l Ltd. P'ship*,
  132 F.4th 1022 (7th Cir. 2025) ........................................ 35, 36

*Golden v. NBCUniversal Media, LLC*,
  688 F. Supp. 3d 150 (S.D.N.Y. 2023) ...................................................... 43

*Gustafson v. Alloyd Co.*,
  513 U.S. 561 (1995) ................................................................................. 20

*Hawks v. J.P. Morgan Chase Bank*,
  591 F.3d 1043 (8th Cir. 2010).................................................................. 44

*Helvering v. Gregory*,
  69 F.2d 809 (2d Cir. 1934) ....................................................................... 33

*Henson v. Santander Consumer USA Inc.*,
  582 U.S. 79 (2017)................................................................................... 21

*In re 2007 Novastar Fin. Inc., Sec. Litig.*,
  579 F.3d 878 (8th Cir. 2009) ................................................................... 44

*In re Crop Inputs Antitrust Litig.*,
  __F.4th__, 2026 WL 924130 (8th Cir. Apr. 6, 2026)............................... 38

*In re Hulu Priv. Litig.*,
  No. 11-cv-03764, 2012 WL 3282960 (N.D. Cal. Aug. 10, 2012)..........19, 20

*In re Nickelodeon Consumer Priv. Litig.*,
  827 F.3d 262 (3d Cir. 2016)........................................... 4, 7, 22, 28, 40, 41

*In re Vizio, Inc., Consumer Priv. Litig.*,
  238 F. Supp. 3d 1204 (C.D. Cal. 2017) ................................................... 29

*Jennings v. Stephens*,
  574 U.S. 271 (2015) ................................................................................. 16

*Johnson v. United States*,
  559 U.S. 133 (2010) ................................................................................. 34

*Laskar v. Hurd*,
  972 F.3d 1278 (11th Cir. 2020)................................................................ 18

*Learning Resources, Inc. v. Trump*,
  146 S. Ct. 628 (2026) ............................................................................... 22

*Lee v. Springer Nature Am., Inc.*,
   769 F. Supp. 3d 234 (S.D.N.Y. 2025) ................................................18, 28

*Mo. Broadcasters Ass'n v. Schmitt*,
   946 F.3d 453 (8th Cir. 2020) .......................................................... 24

*Niz-Chavez v. Garland*,
   593 U.S. 155 (2021) ..................................................................... 28

*PACK Private Cap., LLC v. Associated Bank, N.A.*,
   155 F.4th 981 (8th Cir. 2025) ......................................................4, 44

*Park Irmat Drug Corp. v. Express Scripts Holding Co.*,
   911 F.3d 505 (8th Cir. 2018) .......................................................4, 43

*Perry v. CNN*,
   854 F.3d 1336 (11th Cir. 2017)......................................................3, 31

*Pileggi v. Washington Newspaper Publ'g Co., LLC*,
   146 F.4th 1219 (D.C. Cir. 2025) .........................3, 8, 17, 20, 22, 30, 32–35

*Rumsfeld v. Padilla*,
   542 U.S. 426 (2004) ..................................................................... 28

*Salazar v. Nat'l Basketball Ass'n*,
   118 F.4th 533 (2d Cir. 2024),
   *cert. denied*, 146 S. Ct. 880 (2025) .........................................18, 29, 31, 35

*Salazar v. Paramount Glob.*,
   133 F.4th 642, 649 (6th Cir. 2025),
   *cert. granted*, No. 25-459, 2026 WL 189831 (U.S. Jan. 26, 2026) ..........33, 34

*Sellers v. Bleacher Rep., Inc.*,
   No. 23-cv-00368, 2023 WL 4850180 (N.D. Cal. July 28, 2023)................ 43

*Slack Techs., LLC v. Pirani*,
   598 U.S. 759 (2023) ..................................................................... 28

*Solomon v. Flipps Media, Inc.*,
   136 F.4th 41 (2d Cir.), *cert. denied*, 146 S. Ct. 885 (2025)................. 4, 40–43

*Sony Corp. of Am. v. Universal City Studios, Inc.*,
   464 U.S. 417 (1984) ..................................................................... 5

*Sorrell v. IMS Health Inc.*,
564 U.S. 552 (2011) ................................................................. 23

*Streambend Props. II, LLC v. Ivy Tower Minneapolis, LLC*,
781 F.3d 1003 (8th Cir. 2015) ................................................ 44

*Thomas v. United Steelworkers Loc. 1938*,
743 F.3d 1134 (8th Cir. 2014) ................................................ 27

*Tombari v. NOV Process & Flow Techs. US, Inc.*,
168 F.4th 520 (8th Cir. 2026) ................................................ 15

*Turkiye Halk Bankasi A.S. v. United States*,
598 U.S. 264 (2023) ................................................................. 33

*United States v. Hansen*,
599 U.S. 762 (2023) ................................................................. 25

*United States v. Juan-Manuel*,
222 F.3d 480 (8th Cir. 2000) ................................................ 19

*United States v. Mask of Ka-Nefer-Nefer*,
752 F.3d 737 (8th Cir. 2014) ..............................................4, 44

*United States v. Nunez-Hernandez*,
43 F.4th 857 (8th Cir. 2022) ............................................25, 27

*United States v. Southwestern Cable Co.*,
392 U.S. 157 (1968) ................................................................. 19

*U.S. W., Inc. v. F.C.C.*,
182 F.3d 1224 (10th Cir. 1999) ............................................. 24

*Util. Air Regul. Grp. v. EPA*,
573 U.S. 302 (2014) ................................................................. 34

*Will v. Mich. Dep't of State Police*,
491 U.S. 58 (1989) ................................................................... 23

*Yershov v. Gannett Satellite Info. Network, Inc.*,
820 F.3d 482 (1st Cir. 2016) ...............................3, 31, 32, 42

*Zivotofsky ex rel. Zivotofsky v. Clinton*,
566 U.S. 189 (2012) ............................................................... 25

**Statutory and Constitutional Authorities**

1 U.S.C. § 1 ............................................................................. 41

18 U.S.C. § 2710 ..............................................................*passim*

28 U.S.C. § 1291 ..................................................................... 3

28 U.S.C. § 1331 ..................................................................... 2

28 U.S.C. § 1332 ..................................................................... 2

U.S. Const. amend. I................................................................ 23

**Other Authorities**

E.D. Missouri Rule 4.07............................................................ 44

Encyclopedia.com, Industry Profiles Video Tape Rental............................... 6

Geraldine Fabrikant, *Video Sales Gaining on Rentals*,
The New York Times (Oct. 17, 1989)...................................... 7

Home Recording of Copyrighted Works: The Subcommittee on Courts,
Civil Liberties, and The Administration Of Justice of the House
Comm. on the Judiciary, 97th Cong. 1 (1982)............................ 6

Mollee Shannon, History of the VHS Tape, aperture:
A Kodak Digitizing Blog ..................................................... 5

Patrick Wyman, The Era of the Video Rental Store,
Omaha Exploration (Jan. 22, 2026)........................................ 6

S. Rep. No. 100-599 (1988).................................... 7–9, 17, 20, 24

S. Rep. No. 112-258 (2012)..................................................... 19

The American Heritage Dictionary of the English Language,
New College Edition (1976)................................................. 5

Webster's Ninth New Collegiate Dictionary (1987) ........................ 5

# STATEMENT

Congress passed the Video Privacy Protection Act (the Act) to regulate a multi-billion-dollar industry that was then prominent but has mostly vanished today. Addressing the concern that employees of video rental stores could embarrass patrons by disclosing their rental records—which happened to Judge Robert Bork—Congress built the Act around the term "video tape." That was a physical object that could be bought, sold, rented, and delivered, as they were on a massive scale in 1988.

This case is one of many attempts to convert the Act into an expansive internet-privacy regulation that forbids some—but not most—tools for targeted advertising. Technology like the "Meta Pixel" provides means by which computers communicate with each other with little or no human involvement so that advertisements may be disseminated in maximally efficient fashion, matching marketing content with similar content accessed on a given device or account. This creates the likelihood that internet users receive advertisements that interest them. Reasonable minds can and do differ on the merits of this technology, and different types of coherent legislation could balance privacy concerns against efficiencies and benefits it creates. But the Act has nothing to do with these questions.

Applying a law governing the "video tape" industry in this way is more than a textual distortion. As discussed below, it would subject the worldwide internet to just about the most incoherent system imaginable—one that Congress

did not enact and no rational legislature ever would. The district court correctly declined to endorse that nonsensical outcome.

In all events, this case is uniquely weak among those that seek to extend the Act to web-based video because of the nature of CoStar's business and how little Plaintiff alleges about his activity and the allegedly offensive disclosure. Lack of video tapes aside, CoStar's website apartments.com is not even a video content business. It is an apartment-listing site where property owners may obtain virtual space and tailor it to their tastes. This Court has already rejected the argument that the commercial use of video makes video "*the* business" of the person who uses it. That holding has all the more applicability where CoStar does not even use the video itself. Moreover, Plaintiff does not allege himself to be a protected "consumer" under the Act and provides so little information about any alleged disclosure that he fails to plausibly allege one ever occurred. On any of these or other grounds—seven total—the Court should affirm.

## STATEMENT OF JURISDICTION

The district court had jurisdiction over Plaintiff's federal claim, which was timely removed from state court, under the federal-question statute, 28 U.S.C. § 1331, and the Class Action Fairness Act, *id.* § 1332. (App. 6–12; R. Doc. 1, at 1–7.) The district court entered an order dismissing Plaintiff's claim with prejudice on October 20, 2025. (App. 93–108; Add. 1–16; R. Doc. 34, at 1–16.) Although the district court did not enter judgment "in a separate document," and Plaintiff did not "request that judgment be set out in a separate document," Fed. R. Civ. P. 58(a) and (d), that error does not deprive this Court of

jurisdiction. *See DRE Health Corp. v. BRM Trades, LLC*, 151 F.4th 957, 960 n.1 (8th Cir. 2025). Plaintiff timely appealed on November 19, 2025. (App. 109–11; R. Doc. 35, at 1–3.) This Court has jurisdiction under 28 U.S.C. § 1291.

**STATEMENT OF ISSUES**

1.   Does a statute regulating persons engaged in "the business" of "video cassette tapes or similar audio visual materials," 18 U.S.C. § 2710(a)(3), reach a rental-listing website that enables property owners to design pages as they please, with or without web-based prerecorded video?

**Apposite Authority**: *Christopherson v. Cinema Ent. Corp.*, 161 F.4th 525 (8th Cir. 2025); *Pileggi v. Washington Newspaper Publ'g Co., LLC*, 146 F.4th 1219 (D.C. Cir. 2025) (Randolph, J., concurring).

2.   Does a statute protecting "any renter, purchaser, or subscriber of goods or services from a video tape service provider," 18 U.S.C. § 2710(a)(1), apply where Plaintiff alleges only that he created an account on apartments.com, but not that he received any goods or services, much less video related goods or services?

**Apposite Authority**: *Colson v. Hennepin County*, 169 F.4th 773, 776 (8th Cir. 2026) (pleading standard); *Ellis v. Cartoon Network, Inc.*, 803 F.3d 1251, 1256 (11th Cir. 2015); *Yershov v. Gannett Satellite Info. Network, Inc.*, 820 F.3d 482, 489 (1st Cir. 2016); *Perry v. CNN*, 854 F.3d 1336 (11th Cir. 2017).

3.   Does a statute regulating disclosure of "information which identifies a person as having requested or obtained specific video materials or services," 18 U.S.C. § 2710(a)(3), apply where a complaint alleges hypothetical ways in

which transmission of numbers and letters inscrutable to any person might have occurred?

**Apposite Authority**: *Solomon v. Flipps Media, Inc.*, 136 F.4th 41, 54 (2d Cir.), *cert. denied*, 146 S. Ct. 885 (2025); *Eichenberger v. ESPN, Inc.*, 876 F.3d 979 (9th Cir. 2017); *In re Nickelodeon Consumer Priv. Litig.*, 827 F.3d 262, 284 (3d Cir. 2016).

4.      Is a plaintiff who did not ask the district court for leave to amend, provide a proposed amended pleading, identify substance that could in good faith be added in an amended pleading, or seek relief from an adverse judgment entitled to an appellate order directing leave to replead?

**Apposite Authority**: *Park Irmat Drug Corp. v. Express Scripts Holding Co.*, 911 F.3d 505 (8th Cir. 2018); *United States v. Mask of Ka-Nefer-Nefer*, 752 F.3d 737 (8th Cir. 2014); *PACK Private Cap., LLC v. Associated Bank, N.A.*, 155 F.4th 981 (8th Cir. 2025); *Drobnak v. Andersen Corp.*, 561 F.3d 778 (8th Cir. 2009).

**STATEMENT OF THE CASE**

## A.    Background

1.    A "videotape" is "the magnetic tape used for" a "recording of visual images and sound." Webster's Ninth New Collegiate Dictionary 1314 (1987) (Webster's 1987); *see also* The American Heritage Dictionary of the English Language, New College Edition 1428 (1976) (American Heritage 1976) ("[a] relatively wide magnetic tape . . . used to record television images" (boldface omitted)). "A relatively simple looking device," it "contains two small spools of magnetic tape, including the supply reel and the take-up reel," totaling "about 1,140 feet of tape (nearly four football fields), and about 4 hours of footage." Mollee Shannon, History of the VHS Tape, aperture: A Kodak Digitizing Blog.[1]

Magnetic tape was used in the professional film industry since the 1950s, but it was "the 1970s [that] saw meteoric rise of" Video Home System (VHS) and Betamax tapes along with cassette players and recorders (VCRs and VTRs). *Id.*; *see Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 458 n.1, 492 n.42 (1984) (Blackmun, J., dissenting) (describing the Betamax technology). Within just a few years, "video cassette recorders constitute[d] the most significant new development in the entertainment industry, possibly excepting cable, since the introduction of television itself." Home Recording of

---

[1]    *Available at* https://kodakdigitizing.com/blogs/news/history-of-the-vhs-tape?srsltid=AfmBOopsBABKIQUr0c5eP5VZZHon2bydMzkX-RiBOqPFEZUd8Mo4jjr6 (last visited Apr. 28, 2026).

5

Copyrighted Works: The Subcommittee on Courts, Civil Liberties, and The Administration Of Justice of the House Comm. on the Judiciary, 97th Cong. 1 (1982) (statement of Rep. Kastenmeier).

To purchase a video, consumers "paid $20 to $30 for a [single] movie," Encyclopedia.com, Industry Profiles Video Tape Rental,[2] which would be roughly $70 to $90 today. "Video rental . . . filled the family entertainment niche" because it entailed just "a $3 expenditure to rent a video." *Id.* It was no coincidence that, in 1977, the same year VCR sales began in earnest in the United States, George Atkinson launched the first video rental store in Los Angeles, called The Video Station, which quickly grew to 550 affiliated stores. Patrick Wyman, The Era of the Video Rental Store, Omaha Exploration (Jan. 22, 2026).[3] Competitors followed, including Family Video in 1978, Blockbuster in 1985, and Hollywood Video in 1988. *Id.* "By 1985, the industry posted revenues of $3.5 billion, and by 1990 revenues were $9.8 billion." Encyclopedia.com, *supra*.

2.      In 1988, Congress enacted the Video Privacy Protection Act of 1988, Pub. L. No. 100-618, 102 Stat. 3195 (Nov. 5, 1988), codified at 18 U.S.C. § 2710 (the Act). By that time, "videocassette players" were in about "60 million

---

[2]     *Available at* https://www.encyclopedia.com/economics/economics-magazines/industry-profiles-video-tape-rental-0 (last visited Apr. 28, 2026).
[3]     *Available at* https://omahaexploration.com/2026/01/22/the-era-of-movie-rental-stores/

homes." Geraldine Fabrikant, *Video Sales Gaining on Rentals*, The New York Times (Oct. 17, 1989).[4]

"Congress's purpose in passing the Video Privacy Protection Act was quite narrow." *In re Nickelodeon Consumer Priv. Litig.*, 827 F.3d 262, 284 (3d Cir. 2016). "The impetus for this legislation occurred when" a newspaper "published a profile of Judge Robert H. Bork based on the titles of 146 films his family had rented from a video store." S. Rep. No. 100-599, at 5 (1988). Congress also considered "[s]imilar, though less well publicized, incidents," such as a request by "a woman in a child custody proceeding" for "every film rented by her husband." *Id.* at 6.

Looking to these video rental incidents, Congress built the Act around the term "video tape." Its code title is "Wrongful disclosure of video tape rental or sale records," 18 U.S.C. § 2710, and the liability section's heading is "Video Tape Rental and Sale Records," *id.* § 2710(b). The Act identifies the type of entity it regulates as a "video tape service provider." *Id.* § 2710(a)(4). A video tape service provider is a person "engaged in the business . . . of rental, sale, or delivery of prerecorded video cassette tapes or similar audio visual materials." *Id.* Audio visual materials akin to tapes include "laser disks, open-reel movies, or CDI [compact disc] technology." S. Rep. No. 100-599, at 12.

The Act provides protection only to a "consumer," which is defined as "any renter, purchaser, or subscriber of goods or services from a video tape

---

[4] *Available at* https://www.nytimes.com/1989/10/17/business/video-sales-gaining-on-rentals.html.

service provider." 18 U.S.C. § 2710(a)(1) and (b)(1). The Act protects "personally identifiable information," which includes "information [that] identifies a person as having requested or obtained specific video materials or services from a video tape service provider." *Id.* § 2710(a)(3). Bringing these terms together, the Act prohibits a "video tape service provider" from "knowingly disclos[ing]" to "any person" "personally identifiable information concerning any consumer of such provider." *Id.* § 2710(b)(1). Remedies for such a violation are "robust," *Pileggi v. Washington Newspaper Publ'g Co., LLC*, 146 F.4th 1219, 1224 (D.C. Cir. 2025), and can include actual damages "not less" than $2,500, punitive damages, attorneys' fees, and equitable relief, 18 U.S.C. § 2710(c)(2).

3. Although the legislative history references privacy concerns beyond video rentals, congressmembers could not agree on additional protections. Sponsors of the Act would have liked to legislate concerning "computer checking and check-out counters," "security systems and telephones," "computers," "what [people] buy in a store," "what kind of food they like," "what sort of television programs they watch," "who are some of the people they telephone," "bank[ing] by machine," and other "technological innovations" that, if unregulated, may enable a "Big Brother" supervisory state. S. Rep. No. 100-599, at 5–6. However pressing these worries might be, the Act did not address them. "[T]hat choice (like pretty much everything Congress does) was surely a result of compromise." *Abramski v. United States*, 573 U.S. 169, 186 (2014).

In fact, the legislative history acknowledges that a central concern of members, "library borrower records," went unaddressed in the Act—even though "there is a close tie between what one views and what one reads"—because "the [Judiciary] committee was unable to resolve questions" necessary for a compromise. S. Rep. No. 100-599, at 8. The Congress that passed the Act knew well what "computer technologies" were and how to discuss them. *Id.* at 4; *see also id.* at 6–7. But it inserted no language concerning computers into the Act; its focus was the term "video tape," which appears 12 times.

### B. The Present Controversy

1. CoStar operates multiple websites where property owners may list properties for sale or rent.[5] (App. 15; R. Doc. 1-1, at 1 ¶ 2.) Among its most successful websites is apartments.com, "one of the largest online real estate rental platforms in the nation." (App. 17; R. Doc. 1-1, at 3 ¶ 15.) CoStar does not own or advertise property listed on apartments.com; it instead enables "rental listers" to conduct that business. (App. 18; R. Doc. 1-1, at 4 ¶ 17.)

Rental listers may use different media to advertise their property on apartments.com. Besides still photographs, listers often employ live tours, which are not prerecorded, or three-dimensional tours, which are not videos. (App. 102; Add. 10; R. Doc. 34, at 10.) Listers may also elect to post a prerecorded video walkthrough, which is "a video presentation of the selected

---

[5] Because this case was dismissed on the pleadings, this brief assumes the truth of well-pleaded allegations but admits the truth of none of them. *See Campbell v. Transgenomic, Inc.*, 916 F.3d 1121, 1124 (8th Cir. 2019).

listing." (App. 18; R. Doc. 1-1, at 4 ¶ 18.) Web links cited in Plaintiff's complaint reveal that rental listers use prerecorded tours "a fraction of a fraction of" the time. (App. 101; Add. 9; R. Doc. 34, at 9.)

CoStar "permits" visitors to apartments.com to "create an account by registering" with rudimentary personal information, such as a name, email address, and phone number. (App. 17; R. Doc. 1-1, at 3 ¶ 16.) Users need not create such accounts to access material on apartments.com. The complaint alleges no benefit that users receive for such accounts or commitment that they create.

2. Plaintiff alleges that apartments.com utilizes "tracking pixels and similar tracking technologies such as the Meta Pixel." (App. 19; R. Doc. 1-1, at 5 ¶ 21.) The Meta Pixel is code "that online media providers . . . can integrate into their websites," which communicates information to the social media company Facebook. (App. 19; R. Doc. 1-1, at 5 ¶ 22.) If someone "were to request to watch a video tour of an apartment listing," the complaint alleges that apartments.com "would disclose that information in the form of a URL request" and "identity" a number associated with a Facebook account. (App. 19; R. Doc. 1-1, at 5 ¶ 23.) The complaint alleges "other tracking technologies and pixels that operate similar to the Meta Pixel," with no specifics. (App. 20; R. Doc. 1-1, at 6 ¶ 24.) The complaint also alleges that the privacy policy on apartments.com identifies information the website collects and states that it can be used for marketing. (App. 20; R. Doc. 1-1, at 6–7 ¶¶ 25–30.)

Plaintiff is a Missouri resident who alleges that he created an account on apartments.com and viewed unspecified "video materials, including prerecorded video tours." (App. 22; R. Doc. 1-1, at 8 ¶¶ 34, 36.) He further alleges that he is "a Facebook user." (App. 22; R. Doc. 1-1, at 8 ¶ 35.) From this, he infers that apartments.com disclosed "his video viewing history and identity" to "third parties," "including Facebook." (App. 22; R. Doc. 1-1, at 8 ¶ 37.) He does not allege, however, that he accessed apartments.com and Facebook at the same time, that he was logged into Facebook when he accessed apartments.com, or that Facebook has personally identifying information that could be connected with information from apartments.com to identify him.

Nor does Plaintiff identify any specific disclosure of his personal identifying information and video choices to anyone. Plaintiff does not even allege that he received targeted advertising at any time that was thematically linked to apartment listings of videos he viewed on apartments.com. In fact, Plaintiff admits he "is unaware of the status of his" personally identifying information, "to whom it has been disclosed, and who has possession and retained" it. (App. 23; R. Doc. 1-1, at 9 ¶ 39.) Plaintiff does not allege that any human being has ever learned what videos he watched on apartments.com.

2. Plaintiff filed this case against CoStar in Missouri state court on March 20, 2025, alleging a single claim under the Act. (App. 25–27; R. Doc. 1-1, at 11–13.) Plaintiff claimed to represent a putative class of all United States persons who "subscribed to apartments.com and viewed video materials on the apartments.com website." (App. 23; R. Doc. 1-1, at 9.) CoStar timely removed

11

the case, invoking the district court's federal question jurisdiction and its independent jurisdiction under the Class Action Fairness Act. (App. 6–12; R. Doc. 1, at 1–7.)

CoStar then moved to dismiss the claim on multiple grounds, including that the complaint did not allege it was a video tape service provider regulated by the Act, that Plaintiff is a consumer protected by the Act, or that a disclosure of personally identifiable information in contravention of the Act was adequately alleged. (App. 40–48; R. Doc. 14, at 1–10.) CoStar alternatively challenged the constitutionality of the Act, explaining that it triggers First Amendment scrutiny by regulating dissemination of information and operates in too erratic of a manner to satisfy that standard. (App. 48–53; R. Doc. 14, at 12–15.) In opposing that motion, Plaintiff did not ask the district court for leave to amend, provide a proposed amended pleading, or identify any information he could in good faith add to an amended complaint. (*See* App. 57–72; R. Doc. 20, at 1–15.)

3.    The district court granted the motion to dismiss on multiple independent grounds. (App. 93–108; Add. 1–16; R. Doc. 34, at 1–16.) First, the court held that CoStar is not a regulated video tape service provider both because it does not deliver physical objects like video cassette tapes and because no type of video delivery is its business. (App. 97–103; Add. 5–11; R. Doc. 34, at 5–11.) Second, the court held that Plaintiff is not a protected consumer because he did not allege receipt of a video related good or service in exchange for the account on apartments.com he allegedly opened. (App. 103–105; Add. 11–13;

R. Doc. 34, at 11–13.) Third, the court held that Plaintiff did not adequately allege a disclosure of personally identifiable information because his complaint did not identify "what information is conveyed by the Meta Pixel ID code" or that it somehow "inherently identifies Plaintiff" or "anything about any personally indefinable information contained in his Facebook account." (App. 107; Add. 15; R. Doc. 34, at 15.) Without reaching the constitutional defense, the district court dismissed the case "with prejudice." (App. 108; Add. 16; R. Doc. 34, at 16.)

Plaintiff did not seek relief from the judgment or post-judgment leave to file an amended complaint. He instead took a timely appeal to this Court. (App. 109; R. Doc. 35, at 1.)

## SUMMARY OF THE ARGUMENT

The district court's order stands firm on at least seven independent grounds. This Court should affirm and enjoys the discretion to select the grounds for doing so.

I.     CoStar is not subject to the Act because it is not a video tape service provider. That is for two reasons.

First, CoStar does not deal in "prerecorded video cassette tapes or similar audio visual materials." The video content others post on its website is not the type of physical item the statutory definition embraces. Plaintiff's request that the Act be judicially updated to reach internet-based video badly mangles the coherent scheme Congress applied to the video rental industry in 1988. To

13

impose Plaintiff's proposed system would inflict on the worldwide web an erratic set of rules that Congress did not design and no legislative body would.

Second, even if the Act applied to web-based video, that is not CoStar's "business." CoStar operates an apartment-listing website, not a video delivery service. This Court has already rejected the argument that the Act reaches any business that uses video as a tool in its commercial endeavors. Because CoStar is not alleged to make its livelihood by video delivery, the Act does not reach it.

II.     Plaintiff has no claim under the Act because he is not a "consumer." His contention that he meets that definition as a "subscriber of goods or services" from CoStar fails on three grounds. First, his complaint does not allege any goods or services exchanged as part of any supposed subscription. Second, his complaint does not allege any commitment created by his account with CoStar that is materially different from what would have been the case had apartments.com simply remained one of millions of sites he could access on his browser. And third, he admits he has not alleged a subscription for a video related good or service.

III.     Any claim Plaintiff could bring under the Act would still fail because he does not adequately allege a disclosure of personally identifiable information. As a threshold matter, the complaint does not plausibly allege any type of disclosure. It hypothesizes about the disclosures pixel-based technology can produce but overtly admits that Plaintiff "is unaware of the status of his" personally identifiable information or "to whom it has been disclosed." His allegations stop at conceivable and fail to show a plausible claim.

That aside, the pixel-based disclosure he theorizes does not convey the type of information the Act embraces within its definition of "personally identifiable information." The transmission Plaintiff describes produces a series of inscrutable numbers and letters that cannot convey to any person that any specific person accessed specific videos. Plaintiff's contention that the Act applies to information computers communicate to other computers contravenes its text and represents yet another improper request for amendment from the bench.

IV.    Plaintiff's footnote request for leave to amend is too little and too late. Plaintiff never asked the district court for leave to amend, let alone moved for that relief with the requisite proposed amended pleading. The district court was never apprised of the alterations Plaintiff intends to make and thus had no opportunity to consider whether they would make a difference. The district court could not have abused discretion Plaintiff never permitted it to exercise.

## STANDARD OF REVIEW

This Court reviews the district court's motion to dismiss ruling de novo, "applying the . . . standard used to evaluate a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6)." *Tombari v. NOV Process & Flow Techs. US, Inc.*, 168 F.4th 520, 521 (8th Cir. 2026). Under that standard, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Because "the Federal Rules do not require courts to credit a complaint's conclusory statements without

15

reference to its factual context," the complaint must contain sufficient "factual content to 'nudge' the claim . . . 'across the line from conceivable to plausible.'" *Id.* at 686, 680 (citation and alteration marks omitted). The Court may affirm the judgment on any ground "appearing in the record," regardless of "the reasoning of the lower court." *Jennings v. Stephens*, 574 U.S. 271, 276 (2015) (citation omitted).

## ARGUMENT

### I.    CoStar Is Not a Video Tape Service Provider

CoStar cannot be sued under the Act because it is not a "video tape service provider." To qualify as such, a person must be "in the business" of "rental, sale, or delivery of prerecorded video cassette tapes or similar audio visual materials." 18 U.S.C. § 2710(a)(4). Only a person who meets both elements is covered by the Act. *See Christopherson v. Cinema Ent. Corp.*, 161 F.4th 525, 527 (8th Cir. 2025). CoStar fits neither.

### A.    Video Content Posted on CoStar's Website Is Not a Video Cassette Tape or Similar Item

CoStar is not a video tape service provider because the videos others post to its website are not "video cassette tapes or similar audio visual materials." 18 U.S.C. § 2710(a)(4). Plaintiff is incorrect in proposing that the phrase "similar audio visual materials" reaches "prerecorded videos viewed over the internet." Br. 15.

1.    The textual problem here, as in *Christopherson*, "is what surrounds 'audio visual' in the definition: 'similar' and 'materials.'" 161 F.4th at 528

(citation omitted). Under "the interpretive principle known as ejusdem generis," "general words . . . embrace only objects similar in nature to those objects enumerated by the preceding specific words." *Id.* (citation omitted); *see Delaware v. Pennsylvania*, 598 U.S. 115, 127–28 (2023) (applying this canon to the statutory phrase "money order . . . or other similar written instrument"). Accordingly, the term "'audio visual materials'" must be read "by reference to the item that precedes it, 'prerecorded video cassette tapes.'" *Christopherson*, 161 F.4th at 528. Moreover, "[i]mmediately after 'audio visual' is the word 'materials,'" which indicates "physical existence." *Id.* (citation omitted). These terms identify the "attributes owing to" "video cassettes," including that "they can be touched." *Id.* Audio visual materials like video cassette tapes include "laser disks, open-reel movies, or CDI [compact disc] technology." S. Rep. No. 100-599, at 12.

"[A] short online video clip" is unlike those things; "modem audiences click on a link and receive a stream of ones and zeros in response." *Pileggi*, 146 F.4th at 1239 (Randolph, J., concurring). Visitors to apartments.com who watch a video tour receive no "physical object" that "can be held, stored, rented or sold." *Id.* Nor is a brief tour video anything like the feature-length films formerly available at Blockbuster or Hollywood Video. *Id.* Indeed, the complaint does virtually nothing to allege what "video virtual tours" consist of or how they might be like video cassette tapes. (App. 18; R. Doc. 1-1, at 4 ¶17.) The district court was therefore correct to hold that "the videos on apartments.com are not similar to prerecorded video cassette tapes." (App. 100; Add. 18; R. Doc. 34, at 8.)

2. Plaintiff provides no reason to disturb that ruling. Citing district court decisions, he simply claims that the "weight of authority" favors his view. Br. 14. But the Court is "not merely to count noses. The parties are entitled to [its] independent judgment." *FTC v. Credit Bureau Ctr., LLC*, 937 F.3d 764, 785 (7th Cir. 2019) (citation omitted); *accord Laskar v. Hurd*, 972 F.3d 1278, 1294 (11th Cir. 2020).

Plaintiff does not say what within his authorities' rationale commends itself to this Court's consideration. Nor is any sound reasoning apparent in them. Their central contention is that the Act's "definition is medium-neutral; the defendant must be in the business of delivering video content, but that content need not be in a particular format." *Lee v. Springer Nature Am., Inc.*, 769 F. Supp. 3d 234, 252 (S.D.N.Y. 2025) (quoting and collecting authority). This is manifestly wrong. A "prerecorded video cassette tape[]" is a *medium*, not *content*, and so too must be "similar audio visual materials." 18 U.S.C. § 2710(a)(4). As described above, *see* pp. 8–11, the term "video tape" is the cornerstone supporting the Act's entire linguistic architecture, from title, to persons covered, to liability provisions, to penalties. Decisions that get crystalline text, as well as context, so backwards do not inspire confidence.

Another line of mistaken argument is that a 2012 amendment to the Act confirmed its application to the internet. *See Salazar v. Nat'l Basketball Ass'n*, 118 F.4th 533, 545 (2d Cir. 2024), *cert. denied*, 146 S. Ct. 880 (2025); Br. 15–16. The 2012 amendment *undermines* that very claim with new text permitting informed consent to disclosure of personally identifiable information to be

obtained "through an electronic means using the Internet." 18 U.S.C. § 2710(b)(2)(B). Congress did *not* add any internet reference to the definition of video tape service provider. It therefore remains grounded in the terms "video tape" and "similar audio visual materials." *Id.* § 2710(a)(4). The use of the term "internet" in one provision implies its exclusion elsewhere. *See, e.g.*, *United States v. Juan-Manuel*, 222 F.3d 480, 488 (8th Cir. 2000) (applying the negative implication canon).

While Plaintiff suggests that Congress in 2012 read the text passed 24 years earlier to reach web-based video, the legislative history makes no such assertion. *See* S. Rep. No. 112-258, at 2 (2012). Even if it did, that view would mean little to nothing. *See United States v. Southwestern Cable Co.*, 392 U.S. 157, 170 (1968) (The "views of one Congress as to the construction of a statute adopted many years before by another Congress have 'very little, if any, significance.'" (citation omitted)). This argument exemplifies why courts "do not inquire what the legislature meant" but "only what the statute means." *Avila v. Bondi*, 170 F.4th 1128, 1138 (8th Cir. 2026) (citation omitted). Legislative history, after all, "is not the law." *Id.* (citation omitted).

3.    Equally problematic is the impulse in decisions Plaintiff cites to unmoor the statute beyond its words to far-reaching, abstract "concern[s] with protecting the confidentiality of private information about viewing preferences" and "to cover new technologies for pre-recorded video content." *In re Hulu Priv. Litig.*, No. 11-cv-03764 LB, 2012 WL 3282960, at *6 (N.D. Cal. Aug. 10, 2012). The Act does not reach new technologies that are not the type of "physical

objects" its text references. *Pileggi*, 146 F.4th at 1239 (Randolph, J., concurring). That is no mistake. Objects like "VHS and Betamax tapes," *Christopherson*, 161 F.4th at 527, were the stock in trade of the multi-billion-dollar industry Congress meant to regulate based on discrete concerns arising from that industry, *see* S. Rep. No. 599, at 7–8 (describing statute's application to "video stores"). This established "instructions [that] were clear." *Eichenberger v. ESPN, Inc.,* 876 F.3d 979, 985 (9th Cir. 2017). Businesses that rented, sold, or delivered video tapes or the like knew they were regulated and knew their obligations. And the standards were uniform across participants and products.

That framework cannot be applied to the internet "if the Act is to be interpreted as a symmetrical and coherent regulatory scheme." *Gustafson v. Alloyd Co.*, 513 U.S. 561, 569 (1995). So contorted, the Act's supposed protections of "the confidentiality of private information," *Hulu*, 2012 WL 3282960, at *6, would turn on the accident of whether that information comes in prerecorded video form.

That line of demarcation does not work where media are mixed and matched within sites across a global network spanning innumerable, dissimilar industries. Under Plaintiff's theory, apartments.com visitors who view photographs, live webcasts, or three-dimensional tours receive none of the protection granted to those who view prerecorded videos on the *same* website concerning the *same* content. A sports website could disclose visitors who viewed a live game but not those who watched a rerun of the same game the same day. Viewers of the most "unsettling" content, S. Rep. No. 100-599, at 8, would

20

receive no protection if it were presented in still pictures but vigorous protection if in video. That is not a logical—or even serious—way to regulate internet privacy.

As to industry participants, this bizarre framework would create, not an identifiable and consistent set of duties, but a minefield where materially identical footfalls create, in turn, staggering liability and none at all. Plaintiff's theory, for example, does not prohibit the Meta Pixel, but only a limited subset of its applications that are arbitrarily defined. Equally arbitrary is the process by which a business becomes subject to the Act. A rural newspaper that downloads the Meta Pixel bears no risk so long as it posts articles but faces potentially crippling exposure once it posts a single video, even if it conveys the same information presented in articles.

The beneficiaries of this system would not be internet users but class-action lawyers who can shop for unsuspecting defendants and equally unsuspecting plaintiffs. Plaintiff's theory, in sum, would transform the global internet into one big gotcha game. That is "an absurd and unjust result which Congress could not have intended." *Clinton v. City of New York*, 524 U.S. 417, 429 (1998) (citation omitted).

4.      The underlying problem here is that, in passing the Act, Congress balanced none of the factors related to internet privacy because none were before it. Legislation is "the art of compromise," and "no statute yet known 'pursues its stated purpose at all costs.'" *Henson v. Santander Consumer USA Inc.*, 582 U.S. 79, 89 (2017) (citation and alteration marks omitted). A compromise concerning

internet privacy would account for users' expectation of confidentiality in *all* content, as well as possible exceptions to such expectations. A compromise would also address the technical foundations of the internet—where multiple devices must communicate with each other—and the positive value of targeted advertising, both in enhancing user experiences (by providing materials of likely interest) and in incentivizing free internet content (by affording means of profitability to creators who do not charge visitors directly).

Reasonable minds could balance these factors differently. "[N]orms about what ought to be treated as private information on the Internet are both constantly in flux and often depend on the novelty of the technology at issue." *Nickelodeon*, 827 F.3d at 284. Arguments could be made for banning technology like the Meta Pixel, permitting it, or applying limits and conditions. But no reasonable mind would found an internet privacy framework on the *dispositive* distinction between prerecorded video content (100% protected) and other forms of expression (0% protected). Congress drew that distinction because of "a different problem in a different time." *Pileggi*, 146 F.4th at 1238 (Randolph, J., concurring).

That is the problem with the impulse to "updat[e]" a statute that is "largely obsolete." *Id.* "A casus omissus does not justify judicial legislation." *Ebert v. Poston*, 266 U.S. 548, 554 (1925). Nor does Congress usually "hide elephants in mouseholes." *Christopherson*, 161 F.4th at 530 (citation omitted). The subject of internet privacy is the type of "major question[]" as to which congressional intent to regulate, if actually present, would come in "explicit terms." *Learning*

*Resources, Inc. v. Trump*, 146 S. Ct. 628, 639 (2026); *Biden v. Nebraska*, 600 U.S. 477, 504–05 (2023). And language addressed to video tapes and similar objects "would be a decidedly awkward way of expressing an intent to subject" the worldwide web to a privacy framework. *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 64 (1989). To yield to the temptation to transform the Act beyond its text based on freewheeling policy concerns would disserve both text and policy. This approach would invade the legislative sphere in the worst imaginable framework that no rational legislative body would adopt.

5.      Plaintiff's proposed application of the Act places it—at best—in constitutional doubt. The Act intrudes on free speech rights, *see* U.S. Const. amend. I, by imposing liability on any covered person "who knowingly discloses . . . personally identifiable information concerning any consumer of such provider." 18 U.S.C. § 2710(b)(1). This is a content-based speech restriction because its validity under the Act depends on "the message" it "conveys," *i.e.*, whether it references a customer. *See Barr v. Am. Ass'n of Pol. Consultants, Inc.*, 591 U.S. 610, 618 (2020). And the Act "target[s] those speakers" within the gateway definition and not others who engage in identical speech. *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 565 (2011). Employing this rationale, the Supreme Court in *Sorrell* held that a Vermont law restricting "the sale, disclosure, and use of prescriber-identifying information," which pharmacies receive when processing prescriptions, was both content- and speaker-based and triggered "heightened scrutiny." *Id.* at 571.

Even assuming this refers to the intermediate standard of *Central Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of New York*, 447 U.S. 557 (1980), *but see Am. Association of Political Consultants*, 591 U.S. at 619–20 (applying strict scrutiny to content-based regulation), the Act as applied to web-based video is too erratic to withstand any enhanced level of constitutional review. Disclosures barred by the Act are (but for the Act) "lawful" and "not misleading." *Mo. Broadcasters Ass'n v. Schmitt*, 946 F.3d 453, 460 (8th Cir. 2020). And any governmental interest in privacy is insufficiently "particular" at least when severed from the Act's originally contemplated context. *U.S. W., Inc. v. F.C.C.*, 182 F.3d 1224, 1234–35 (10th Cir. 1999). The evidence before Congress involved risks of video rental disclosures with no connection to the entirely unique considerations of the internet, described above. S. Rep. No. 100-599, at 5–6.

For the same reason, the Act's application to web-based video would not advance a privacy interest "in a direct and material way" because only "speculation or conjecture" could justify that startling result. *Fla. Bar v. Went For It, Inc.*, 515 U.S. 618, 625–26 (1995). Moreover, the Act's erratic proposed application to just a small subset of materials within even one website—not to mention the entire internet—would be so grossly underinclusive as to destroy any credibility in a claimed internet-privacy interest. *City of Ladue v. Gilleo*, 512 U.S. 43, 51 (1994). In addition, the Act as Plaintiff wields it is "more extensive than necessary to further the government's interest." *Mo. Broadcasters*, 946 F.3d at 460. The Act could, as drafted and intended, be tailored to video tapes and similar audio visual materials.

The Court need not ultimately resolve this issue because "the canon that statutes should be interpreted to avoid constitutional doubts" controls in the presence of any ambiguity. *Clark v. Martinez*, 543 U.S. 371, 379 (2005). Even if CoStar's "reading were not the best one"—it is—"the interpretation is at least 'fairly possible'—so the canon of constitutional avoidance would still counsel [this Court] to adopt it." *United States v. Hansen*, 599 U.S. 762, 781 (2023). Plaintiff, however, "presses" the Act "toward the most expansive reading possible, effectively asking [the Court] to apply a canon of 'constitutional collision.'" *Id.* (citation omitted). The Court should decline that invitation.[6]

### B.    CoStar Is Not a Video Delivery Service

Even if web-based video were within the Act's gateway definition, video rental, sale, or delivery is not in any event "the business" of CoStar. 18 U.S.C. § 2710(a)(4). Rather, CoStar's business is operating a website on which property owners list apartment units for rent. (App. 17–18; R. Doc. 1-1, at 3-4 ¶¶ 16–17.) As the district court put it, "CoStar is in the business of connecting property owners and renters." (App. 102; Add. 10; R. Doc. 34, at 10.)

Plaintiff does not dispute this basic point. Instead, he proposes that CoStar made video delivery its business by "allowing its rental listers to offer video virtual tours." (App. 18; R. Doc. 1-1, at 4 ¶ 17.) But the involvement of video

---

[6] If the Court were to reverse the judgment, it would be proper to permit the district court to address the fulsome constitutional defense (beyond the avoidance canon) in the first instance. *United States v. Nunez-Hernandez*, 43 F.4th 857, 859 (8th Cir. 2022) ("we are a court of 'review, . . . not first view'" (quoting *Zivotofsky ex rel. Zivotofsky v. Clinton*, 566 U.S. 189, 201 (2012))).

somewhere in a person's enterprise does not make video delivery "*the* business" of that person. 18 U.S.C. § 2710(a)(4) (emphasis added). "[T]o be engaged 'in the business' of something generally means to be regularly engaged in it for livelihood or gain." *Christopherson*, 161 F.4th at 529 (citation omitted). For example, this Court in *Christopherson* explained that a movie theater's "business is selling movie tickets and concessions." *Id.* Movie trailers on the theater's website did not change this basic fact, even though this was "a way to get potential customers in the seats by generating interest and anticipation for a film." *Id.* The use of website trailers did not "[b]y itself" mark the "transaction" by which the theater achieved "livelihood or gain," and no ordinary English speaker would say that a movie theater's business is "posting free movie trailers on [its] website[]." *Id.* at 529–30.

Videos on CoStar's website do not make it a video tape service provider for the same reasons. The complaint does not (and could not) allege that CoStar charges visitors to view video apartment tours or even that it requires that they provide something of value (or even personal information) as a condition of watching them. These, like the trailers in *Christopherson*, are "free" for website guests. *Id.* at 530. It makes no difference whether web-based videos are "an integral part" of apartments.com. Br. 11. Generating interest in films and filling seats are integral parts of a theater's business, but its use of videos to those ends does not make it a video delivery service. *Christopherson*, 161 F.4th at 529–30. Likewise, the option rental listers have to post videos does not "[b]y itself" constitute CoStar's source of income. *Id.* at 529. As in *Christopherson*, Plaintiff

alleges merely that the videos are means of "attracting renters." (App. 18; R. Doc. 1-1, at 4.)

The video content at issue here is further removed from CoStar's business because it is not even CoStar's content. Contrary to Plaintiff's assertion, CoStar is not alleged to be "creating and displaying prerecorded video tours." Br. 11. It is rental listers who—if they choose—create and upload videos to apartments.com. Plaintiff does not even attempt to say how video delivery could become CoStar's business merely by its "allowing" others to engage in that. (App. 18; R. Doc. 1-1, at 4 ¶ 17.) Moreover, rental listers need not post videos and usually don't. Reviewing web links cited in Plaintiff's complaint, the district court was struck by how rarely listers use video tours—just "a fraction of a fraction" of the time. (App. 101; Add. 9; R. Doc. 34, at 9.) Indeed, the complaint does not allege that listers are charged for posting videos or that the *allowance* of videos generates any specific income for CoStar.[7]

*Christopherson* rejected Plaintiff's implicit suggestion, *see, e.g.*, Br. 10–11, that—decades after the Act's passage—just about every business has become a video tape service provider because of the prevalence of audio visual materials.

---

[7] Plaintiff attempts to backfill with "[a]dditional facts" concerning how CoStar is "specifically paid," Br. 11 n.1, as well as various lawyers' assertions, such as that "Defendant *is* paid by apartment owners and managers for hosting and creating video tours," Br. 10. The complaint neither includes nor supports such assertions. "[A]n attempt to amend one's pleadings in an appellate brief comes too late." *Dorothy J. v. Little Rock Sch. Dist.*, 7 F.3d 729, 734 (8th Cir. 1993) (citation omitted); *see also Thomas v. United Steelworkers Loc. 1938*, 743 F.3d 1134, 1140 (8th Cir. 2014); *see infra* § IV.

This Court explained that McDonald's commercial use of video does not change the fact that its business is "selling hamburgers." 161 F.4th at 529–30. Similarly, video tours do not make an apartment-listing service a video rental or delivery service. By requiring that video rental, sale, or delivery be "*the* business" of a defendant, 18 U.S.C. § 2710(a)(4) (emphasis added), the Act requires that this be the defendant's "discrete" occupation, not merely *a* tool the defendant—or someone else—uses. *Niz-Chavez v. Garland*, 593 U.S. 155, 166 (2021); *see also Slack Techs., LLC v. Pirani*, 598 U.S. 759, 767 (2023); *Rumsfeld v. Padilla*, 542 U.S. 426, 434 (2004). The text establishes a "1988 paradigm" of video rental services, and "[e]very step away from" that paradigm "will make it harder for a plaintiff to make out a successful claim." *Nickelodeon*, 827 F.3d at 290. CoStar's apartment-listing model is even further removed from the video rental paradigm than the ticket- and concession-selling model in *Christopherson*.

The district court precedents on which Plaintiff principally rests, *see* Br. 11–13, stand in tension with *Christopherson* because they generally describe a business-related use of video and make no effort to identify the defendant's business itself (*e.g.*, selling hamburgers, tickets and concessions, or space for apartment listings). That point aside, most of these decisions addressed an exchange where visitors provide information or payment or view advertisements for access to the defendant's videos. *See, e.g.*, *Lee v. Springer Nature Am., Inc.*, 769 F. Supp. 3d 234, 252–53 (S.D.N.Y. 2025) (Scientific American); *Ambrose v. Bos. Globe Media Partners LLC*, No. 21-cv-10810, 2022 WL 4329373, at *2 (D. Mass. Sept. 19, 2022) (Boston Globe); *Collins v. Toledo Blade*, 720 F.

Supp. 3d 543, 554 (N.D. Ohio 2024) (Toledo Blade); *In re Vizio, Inc., Consumer Priv. Litig.*, 238 F. Supp. 3d 1204, 1221–22 (C.D. Cal. 2017) (Vizio Smart TV). There is at least some arguable resemblance to the video rental paradigm in a "transaction," *Christopherson*, 161 F.4th at 529 (citation omitted), where website visitors provide something for video content.

But the complaint establishes no such transaction here. As far as the threadbare allegations reveal anything about CoStar's business—which itself is a substantial deficiency of Plaintiff's own making—it indicates an exchange of listing space for unspecified consideration by property owners. (App. 17–18; R. Doc. 1-1, at 3–4 ¶¶ 15–18.) The complaint alleges that visitors *may* subscribe by providing information, not that they *must*. (App. 17; R. Doc. 1-1, at 3 ¶ 16.) CoStar is not alleged even to "dabble in video rentals." *Salazar*, 118 F.4th at 549 (dictum). The point here is not that video rental or delivery is just one among several of CoStar's businesses. *See* Br. 10. Those are *none* of its businesses. CoStar is therefore not a video tape service provider.

## II.   Plaintiff Is Not a Consumer

Plaintiff's claim fails for the independent reason that he does not allege himself to be a "consumer" protected by the Act. The statute forbids only disclosures "concerning any consumer." 18 U.S.C. § 2710(b)(1). It defines "consumer" to mean "any renter, purchaser, or subscriber of goods or services from a video tape service provider." *Id.* § 2710(a)(1). Even if CoStar were a video tape service provider—it is not—Plaintiff does not allege that he rented, purchased, or subscribed to any good or service it provided, let alone "a video

29

or similar audio-visual good or service." *Pileggi*, 146 F.4th at 1232 (majority opinion).

### A. The Complaint Does Not Allege A Subscription "of" Goods or Services "from" CoStar

Plaintiff's claim is not based on an alleged rental or purchase. *See* Br. 16. He instead claims to have become a "subscriber" by "registering for an account" on apartments.com. (App. 22; R. Doc. 1-1, at 8 ¶ 35.) This argument misses that, whatever the term "subscriber" means, *see infra* § II.B and C, the subscription must be "*of* goods or services *from* a video tape service provider." 18 U.S.C. § 2710(a)(1) (emphasis added). At a minimum, then, Plaintiff would have to receive goods or services from CoStar in exchange for his subscription to qualify as a subscriber.

But the complaint does not allege this. It states that CoStar "*permits* its Website users to subscribe and create an account by registering" with certain information. (App. 17; R. Doc. 1-1, at 3 ¶ 16 (emphasis added).) This allegation makes clear that an account is not a condition for visiting the website or reviewing its content. Accordingly, Plaintiff is wrong in stating that he is alleged to have "provid[ed] valuable data in exchange for access to" anything. Br. 17. That assertion finds no support in the complaint's "factual matter." *Colson v. Hennepin County*, 169 F.4th 773, 776 (8th Cir. 2026) (citation omitted). Nor is this omission made up in the allegation that Plaintiff "used his account . . . to view video materials." (App. 22; R. Doc. 1-1, at 8 ¶ 36.) The complaint makes clear that Plaintiff could have viewed the materials without an account. Thus,

even if access were considered "goods and services," the subscription is not *of* them. The claim fails on that basis alone.[8]

**B.  The Complaint Alleges No Commitment Necessary to a Subscriber Relationship**

Plaintiff independently fails to establish that his alleged account makes him a "subscriber." The various dictionary definitions of that term point to a "common thread . . . that 'subscription' involves some type of commitment, relationship, or association (financial or otherwise) between a person and an entity." *Ellis v. Cartoon Network, Inc.*, 803 F.3d 1251, 1256 (11th Cir. 2015). While courts have differed on the margins in applying this standard, *compare id.* at 1257 (application download would not create subscriber status), *with Yershov v. Gannett Satellite Info. Network, Inc.*, 820 F.3d 482, 489 (1st Cir. 2016) (opposite result), they agree in principle that some "commitment" is necessary, at the very least akin to continued "seamless access to an electronic version of *USA Today*," *id.*, or "periodic NBA-related updates," *Salazar*, 118 F.4th at 552; *see Perry v. CNN*, 854 F.3d 1336 (11th Cir. 2017).

The complaint here is bereft of any allegations identifying a commitment beyond Plaintiff's temporary—and unconditioned—access to the website. Even accepting the conclusory assertion that he (unnecessarily) "used his account . . . to view video materials . . . within the past year" (App. 22; R. Doc. 1-1, at 8 ¶ 36), no factual content shows "a relationship" between CoStar

---

[8] Plaintiff again attempts to amend his complaint on appeal with an entirely new theory that terms of service established a subscription. Br. 17 n.3. This "comes too late." *Dorothy J.*, 7 F.3d at 734 (citation omitted); *see infra* § IV.

and Plaintiff "that is materially different from what would have been the case had [apartments.com] simply remained one of millions of sites on the web that [Plaintiff] might have accessed through a web browser." *Yershov*, 820 F.3d at 489. Plaintiff's website access differed in no respect from anyone else's. The complaint fails to identify what Plaintiff believes he obtained from his supposed subscription, let alone that some ongoing association was established. And his (belated) theory that terms of service establish a condition to visiting apartments.com, *see supra* note 9, also fails to establish anything beyond a temporary relationship. This deficiency independently dooms Plaintiff's claim.

## C. The Complaint Does Not Allege a Subscription for an Audio Visual Good or Service

In all events, Plaintiff concedes he has not alleged that he subscribed to "a video or similar audio-visual good or service." *Pileggi*, 146 F.4th at 1232; Br. 18–22. Insofar as the Court finds it necessary to reach this issue, which is unnecessary to the judgment, Plaintiff is incorrect in his contention that a person becomes a subscriber by purchasing "*any . . .* goods or services" from a video tape service provider.[9] Br. 20.

As noted, the Act defines "consumer" as "any renter, purchaser, or subscriber of goods or services from a video tape service provider." 18 U.S.C. § 2710(a)(l). Plaintiff contends that the term "goods or services" is subject to no

---

[9] As Plaintiff notes, the Supreme Court has granted certiorari to address this question next term in *Salazar v. Paramount Global*, 25-459. This Court, however, denied Plaintiff's unopposed motion to hold this case in abeyance pending *Salazar*. Order, Entry ID: 5604587 (8th Cir. Feb. 4, 2026).

"limitation." Br. 19. He is wrong. They must be from a video tape service provider, which (as noted) is a person "in *the* business" of "prerecorded video cassette tapes or similar audio visual materials." 18 U.S.C. § 2710(a)(4) (emphasis added). The goods and services that make a person a video tape service provider are audio visual materials.

"The logical meaning of the sentence as a whole is that a consumer is a person who obtains the products or services that one seeks from a video tape service provider—that is, videos." *Pileggi*, 146 F.4th at 1235. By comparison, a statute protecting "the consumers of 'goods or services from a medical provider'" would naturally reference "those who received medical services, not those who only bought a coffee in the foyer." *Id.* Plaintiff "errs by reading the terms 'goods or services' 'in isolation,'" *Salazar v. Paramount Glob.*, 133 F.4th 642, 649 (6th Cir. 2025), *cert. granted*, No. 25-459, 2026 WL 189831 (U.S. Jan. 26, 2026), notwithstanding that "the meaning of a sentence may be more than that of the separate words, as a melody is more than the notes," *Helvering v. Gregory*, 69 F.2d 809, 810–11 (2d Cir. 1934) (L. Hand, J.).

Plaintiff's theory also fails to read the definition of "consumer" "alongside its neighboring . . . provisions" within "'the overall statutory scheme.'" *Turkiye Halk Bankasi A.S. v. United States*, 598 U.S. 264, 275 (2023) (citation omitted). The Act is called the "Video Privacy Protection Act of 1988," Pub. L. No. 100-618, § 1, 102 Stat. 3195 (1988), its code title is "Wrongful disclosure of video tape rental or sale records," 18 U.S.C. § 2710; *see* Pub. L. No. 100-618, § 2, 102 Stat. at 3195, and the liability section's heading is "Video Tape Rental and Sale

Records," 18 U.S.C. § 2710(b); *see* Pub. L. No. 100-618, § 2, 102 Stat. at 3195. It is unlikely that, in repeatedly focusing on video related records, Congress actually meant to protect persons based on entirely different products or services. *See Dubin v. United States*, 599 U.S. 110, 121 (2023) (explaining how a statute's "title" can "shed light on its text"). It is odd for Plaintiff to fault Congress for "omitting" the term "video" (in isolated form)[10] from the definition of "subscriber," Br. 19, when "the term 'video' already appears in the title, five times in the definitional section, and thirteen times in the statute as a whole." *Pileggi*, 146 F.4th at 1236. "Even though—standing alone—the expression 'goods or services' is not limited, its association with surrounding words cabins its meaning." *Salazar*, 133 F.4th at 650.

Additional contextual points confirm the proper scope of this definition. *See Johnson v. United States*, 559 U.S. 133, 139 (2010) ("Ultimately, context determines meaning."). One is the crushing penalty and punitive damages provisions, given that "statutes with civil penalties that punish and deter must be construed narrowly, ensuring fair notice to regulated parties." *Pileggi*, 146 F.4th at 1233.

Another is the "unworkable" framework Plaintiff's reading would create. *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 320 (2014). Website operators have no way to "differentiate between those who just visit the website and those who visit the website after having at some unknown prior time purchased some

---

[10] Indeed, "video" appears in the definition of "subscriber" as "*video* tape service provider."

different good or service." *Pileggi*, 146 F.4th at 1234. Operators would either be unable to comply or "have to assume that all visitors to their websites are consumers," leaving that definition "'no work to do' in the statute." *Id.* Ultimately, Plaintiff's theory creates yet another regulatory minefield: one person "could purchase a single ticket at a baseball game and then sue the baseball team's owner after watching a free video on the team's website years later" but another who "just visit[ed] the website without first buying a ticket or another good or service would not enjoy the Video Privacy Act's protections." *Id.* at 1233. "Nothing in the Act's language, structure, or purpose warrants such haphazard and unreasoned line-drawing." *Id.* at 1234.

Plaintiff asks the Court to look to opinions of the Second Circuit, *Salazar*, 118 F.4th at 552–53, and the Seventh, *Gardner v. Me-TV Nat'l Ltd. P'ship*, 132 F.4th 1022, 1024–25 (7th Cir. 2025). Br. 18. The district court was right to find them "unpersuasive." (App. 104–05; Add. 12–13; R. Doc. 34, at 12–13.) *Salazar* relied principally on "meaningful variation" in the use of the term "video," which it thought "shows that Congress knew to include an audiovisual limitation in the VPPA when it wanted one to apply." *Salazar*, 118 F.4th at 547. But, as the D.C. Circuit explained, "[t]he point of statutory canons . . . is to aid in resolving ambiguous statutory terms or phrases, not to cause a court to miss the forest for a single tree." *Pileggi*, 146 F.4th at 1235. "The placement of 'video' at the end rather than the beginning of the definition of 'consumer' is a frail excuse for reading the Video Privacy Act to reach far beyond its textual 'metes and bounds.'" *Id.* at 1236 (citation omitted).

To its credit, the Seventh Circuit recognized that the Act "is aimed principally at information about videos," but oddly found this purpose expressed only "in the definition of 'video tape service provider' rather than the definition of 'consumer.'" *Gardner*, 132 F.4th at 1025. The definition of "consumer" contains the term "video tape service provider," and, as explained, shows that the requisite goods are services are those that make a person a video tape service provider. So the Seventh Circuit was simply wrong to contend that the D.C. Circuit and Sixth Circuit approach ignores "the meaning of the words Congress selected." *Id.* Their approach is far more consistent with the Act's text taken in proper context.

## III. No Disclosure of Personally Identifiable Information Occurred

Yet another dispositive basis for the judgment is Plaintiff's failure to allege that CoStar "disclose[d]" "personally identifiable information concerning" him. 18 U.S.C. § 2710(b)(1). Personally identifiable information includes that "which identifies a person as having requested or obtained specific video materials or services." *Id.* § 2710(a)(3). The district court found Plaintiff's allegations too threadbare to show a disclosure of personally identifiable information. (App. 107; Add. 15; R. Doc. 34, at 15.) That ruling was correct and is, besides, supportable on independent grounds.

### A. The Complaint Does Not Allege a Disclosure

Plaintiff challenges the district court's ruling based on the supposed breadth of his allegations concerning the Meta Pixel and "disclosure admissions" in CoStar's privacy policy. Br. 23–27. But he fails to confront his

own allegation that he "is unaware of the status of his PII" or "to whom it has been disclosed." (App. 23, R. Doc. 1-1, at 9 ¶ 39.) When read together with the complaint "as a whole," *Allan v. Minnesota Dep't of Hum. Servs.*, 127 F.4th 717, 720 (8th Cir.) (citation omitted), *cert. denied*, 146 S. Ct. 94 (2025), this admission confirms that Plaintiff shows at most how personally identifiable information *may* be transferred from one website to another, not that a disclosure identifying him with a specific video *did* occur here.

The only concrete allegations Plaintiff provides about himself are that he "has been a Facebook user" and "view[ed] video materials" on apartments.com. (App. 22; R. Doc. 1-1, at 8 ¶¶ 35–36.) Plaintiff contends that CoStar "utilize[es] tracking pixels and similar tracking technologies such as the Meta Pixel" and that it reserves the right to use certain information for advertising and infers a transfer of information concerning him and his video selections. (*See* App. 19–23; R. Doc. 1-1, at 5–9 ¶¶ 21–31, 35–37.) The complaint, however, identifies no disclosure to anyone linking him with any specific video. Moreover, Plaintiff identifies no illustrative tracking technologies besides the Meta Pixel that CoStar might have used or how those technologies work. It is not entirely clear even that apartments.com is alleged to have used the Meta Pixel, just technologies "such as the Meta Pixel," and Plaintiff in all events only identifies what "would" be disclosed by the Meta Pixel "if a Subscriber were to watch a video tour." (App. 19; R. Doc. 1-1, at 5 ¶¶ 22–23.)

These spare, theoretical assertions do not get Plaintiff past the mere "conceivable." *Twombly*, 550 U.S. at 570. While the complaint alleges how Meta

37

Pixel "would" potentially operate, that does not show anything about how other technologies "such as" the Meta Pixel "would" operate. Moreover, it does not follow from Plaintiff's Facebook account *per se* that any tracking that *would* typically occur actually *did* occur here.

The complaint does not allege whether Plaintiff used the same device to access Facebook and apartments.com, whether he logged in to Facebook from the same browser he used when he accessed videos on apartments.com, or whether his Facebook account contains "any personally identifiable information." (App. 107; Add. 15; R. Doc. 34, at 15.) Read together with Plaintiff's admission that he "is unaware of the status of his PII" or "to whom it has been disclosed" (App. 23; R. Doc. 1-1, at 9 ¶ 39), these allegations reveal themselves as a kind of crude guesswork, not "factual matter" showing that a disclosure linking Plaintiff's identity to a specific video actually occurred. *Twombly*, 550 U.S. at 556.

Additionally, this is a proper case to consult "judicial experience and common sense." *In re Crop Inputs Antitrust Litig.*, __F.4th__, 2026 WL 924130, at *2 (8th Cir. Apr. 6, 2026). Individuals typically know if their specific browsing choices have been disclosed because they receive thematically related targeted advertising. *See Christopherson*, 161 F.4th at 526 (noting allegation that, "[a]fter Christopherson watched some" movie trailers on the defendant's website, "movie ads started appearing on her Facebook page"). When a person's video viewing is disclosed under an advertising policy like Plaintiff alleges, it is easy for that person to know and allege this with facts, not mere hypotheses. If, as

Plaintiff theorizes, he "*were* to request to watch" a video about a Chicago apartment and CoStar "*would* disclose" this choice to Facebook, Plaintiff *would* also receive advertisements on Facebook for Chicago-area apartments. (*See* App. 19; R. Doc. 1-1, at 5–6 ¶ 23 (emphasis added).) Plaintiff's inability to allege the last point—combined with his subjunctive expression of the first two points—shows that what is conceivable as concept is not plausibly asserted here as fact. Any remaining doubt should fall away with Plaintiff's admission that he "is unaware" of what actually occurred. (App. 23; R. Doc. 1-1, at 9 ¶ 39.)

**B.     The Type of Disclosure Hypothesized Does Not Identify a Person to Any Person in a Manner Any Person Could Understand**

The district court's ruling is independently supportable on the ground that disclosures "such as" those resulting from the Meta Pixel do not contain "personally identifiable information." 18 U.S.C. § 2710(a)(3).

1.     Plaintiff's illustrative example of a transmission is not one that "identifies a person as having requested or obtained specific video materials or services." *Id.* This is the information Plaintiff suspects is at issue:



(App. 94; Add. 2; R. Doc. 34, at 2.) This image identifies neither a person nor specific video materials. It reflects many "lines of computer code" with "many characters, numbers, and letters" that are indecipherable to any human recipient. *Solomon v. Flipps Media, Inc.*, 136 F.4th 41, 54 (2d Cir.), *cert. denied*, 146 S. Ct. 885 (2025). Courts have consistently declined to treat transmission of "data points" as disclosure of personally identifiable information prohibited by the Act. *Nickelodeon*, 827 F.3d at 290; *Solomon*, 136 F.4th at 51–54; *Eichenberger*, 876 F.3d at 984–86.

2.      Plaintiff proposes that the disclosure fits the statutory definition because Facebook's computers might "translate that into a person's actual identity." Br. 28 (citation omitted). But the statutory text is not fairly read to reach "digital identifiers decipherable only by a technologically sophisticated third party." *Solomon*, 136 F.4th at 52. The statute requires identification of "a person," 18 U.S.C. § 2710(a)(3), while digital transmissions link numbers and letters to devices or accounts. As noted above, Plaintiff did not adequately allege

that his Facebook account would enable Facebook to identify him (App. 107; Add. 15; R. Doc. 34, at 15), and an account number would be insufficient for identification in many cases.

Moreover, the statute forbids disclosure, not to a machine, but to "any person." *Id.* § 2710(b)(1). That second use of "person" contemplates the type of disclosure that a human could understand and react to.[11] The statutory text is therefore most "naturally read as referring to information that would permit an ordinary person to learn another individual's video watching history." *Solomon*, 136 F.4th at 52. Indeed, the statute establishes a "paradigm" of "a video clerk leaking an individual customer's video rental history." *Nickelodeon*, 827 F.3d at 290. The fact pattern here, where websites communicate without human involvement, is "simply too far afield from the circumstances that motivated the Act's passage to trigger liability." *Id.*

For yet another thing, "the statute views disclosure from the perspective of the disclosing party" and thus cannot turn on "what the recipient of that information decides to do with it." *Eichenberger*, 876 F.3d at 985. Viewing the disclosure as a person would rather than as a machine would "provides video service providers with enough guidance to comply with the VPPA's requirements." *Id.*

---

[11] While disclosure to an employee of Facebook might be a disclosure to the corporate person under agency law, it is unnatural to read disclosure to a computer system that no person ever sees as disclosure to any person, corporate or individual. The term "person" may sometimes mean "corporations" but not machines. 1 U.S.C. § 1 ("person").

3. This plain-text reading creates no "loophole" in the statute, as Plaintiff claims. Br 29–30 (citation omitted). It is the insistence on transforming the Act into an all-purpose data-privacy law that makes the statutory definition "awkward and unclear." *Yershov*, 820 F.3d at 486. Read properly to protect humans from the embarrassment that may result if other humans learn the videos they buy or rent, the Act's definition is fully up to the task. No realistic prospect of that is alleged here. Nothing in the complaint suggests anybody knows what Plaintiff watched on apartments.com. Nor does this standard create a problem of identifying "the user's more general knowledge," such as fluency in a "non-English language." Br. 29 (citation omitted). Plaintiff does not allege that CoStar's website communicated about him in Spanish or French but with numbers and letters that no human—certainly no ordinary human—can read.

Cases splitting from the majority view have reasoned that the definition "is not limited to information that explicitly names a person." *Yershov*, 820 F.3d at 486. But decisions taking the majority position have accepted that the definition includes "information *capable* of being used" to identify a person. *Solomon*, 136 F.4th at 51. It does not follow, however, that any data transmission by a computer to a computer can identify a person to a person. It is one thing to read the Act to prohibit transfer of a video rental history with the notation that it belongs to "a man whose judicial confirmation hearing is set to begin September 15, 1987." It is quite another to read it to prohibit the transmission of the number "165133063922593." (App. 94; Add. 2; R. Doc. 34, at 2.) That latter view, at the least, is incorrect.

4.      Plaintiff presents an alternative argument that he can meet the prevailing "ordinary person" standard. *See* Br. 29–30. But he devotes most of that section to challenging that standard as "inconsistent" with the Act. Br. 29. The error in that view is shown above.

Plaintiff also contends "that Facebook IDs by themselves can be identifying if used by an ordinary person." Br. 30. Plaintiff does not explain how that could be so. Nor does he identify allegations in his complaint showing this. Notably, he does not point out what about the image in his own complaint identifies a person and a video to another person or say whose identity it discloses. Indeed, Plaintiff's complaint does not even allege that image concerns him. (App. 19–20; R. Doc. 1-1, at 1–6 ¶ 23.) The Second Circuit had little trouble seeing that an ordinary person finds no meaning in the figure "% 9C% 93% 20In% 20the% 20last% 20weekend% 20of% 20-July% 2C." *Solomon*, 136 F.4th at 54. The contrary authority Plaintiff cites—including a decision that is bad law after *Solomon*—do not answer this basic point. *See Sellers v. Bleacher Rep., Inc.*, No. 23-cv-00368, 2023 WL 4850180, at *4–5 (N.D. Cal. July 28, 2023); *Golden v. NBCUniversal Media, LLC*, 688 F. Supp. 3d 150, 159 (S.D.N.Y. 2023).

## IV.   Plaintiff Has No Basis to Seek Leave to Amend

In a series of footnotes, Plaintiff curtly faults the district court for denying him the "opportunity" to "amend" his complaint. Br. 31 n. 5; *see also* Br. 11 n.1; Br. 17 n. 3. But Plaintiff "never moved to amend [his] complaint" nor even asked for leave at any point below. *Park Irmat Drug Corp. v. Express Scripts Holding Co.*, 911 F.3d 505, 519 (8th Cir. 2018); (*see* App. 5; App. 57–72; R. Doc. 20, at

1–15). "[A] district court in granting a motion to dismiss is not obliged to invite a motion for leave to amend if plaintiff did not file one." *United States v. Mask of Ka-Nefer-Nefer*, 752 F.3d 737, 742 (8th Cir. 2014). The district court cannot be found to have abused its discretion in "[d]enial of leave to amend," Br. 17 n.3, when it never received a motion for leave at all. *PACK Private Cap., LLC v. Associated Bank, N.A.*, 155 F.4th 981, 985 (8th Cir. 2025) (denying request "that we remand with instructions to allow leave to amend" where appellant "did not move for leave to amend").

Importantly, the district court was never presented with "changes" Plaintiff "would make" to his complaint "to avoid dismissal." *Drobnak v. Andersen Corp.*, 561 F.3d 778, 787 (8th Cir. 2009). The Eastern District of Missouri requires that a request for leave to amend include "[a] proposed amendment," E.D. Missouri Rule 4.07, and that rule must be satisfied for the request for leave to be preserved, *In re 2007 Novastar Fin. Inc., Sec. Litig.*, 579 F.3d 878, 884 (8th Cir. 2009). The request for leave for the first time on appeal is especially improper, given that "a more restrictive standard" applies to post-judgment requests for leave to amend. *Streambend Props. II, LLC v. Ivy Tower Minneapolis, LLC*, 781 F.3d 1003, 1010 (8th Cir. 2015). Even had he asked the district court for leave after judgment, Plaintiff would have no opportunity for leave as of right. *Hawks v. J.P. Morgan Chase Bank*, 591 F.3d 1043, 1050 (8th Cir. 2010). Plaintiff provides no justification for waiting until the *appeal* to raise the issue for the first time and cannot show abuse of discretion that he never

permitted the district court to exercise. The judgment dismissing the case with prejudice should be affirmed without qualification.

## CONCLUSION

The Court should affirm the district court's judgment.

Dated: April 29, 2026                              Respectfully submitted,

                                                   */s/ Bonnie Keane DelGobbo*
RICHARD B. RAILE                                   BONNIE KEANE DELGOBBO
BAKER & HOSTETLER LLP                              JOEL C. GRISWOLD
1050 Connecticut Ave., N.W.                        BAKER & HOSTETLER LLP
  Suite 1100                                       One North Wacker Dr.
Washington, D.C. 20036                               Suite 4500
(202) 861-1711                                     Chicago, IL 60606
rraile@bakerlaw.com                                (312) 416-6200
                                                   bdelgobbo@bakerlaw.com
                                                   jcgriswold@bakerlaw.com

## Certificate of Compliance

This brief complies with the type-volume limitations imposed by Federal Rule of Appellate Procedure 32(a)(7)(B)(i) because it contains 11,620 words, excluding the parts of the brief exempted by Rule 32(f). This brief complies with the typeface and typestyle requirements of Federal Rules of Appellate Procedure 32(a)(5) and 32(a)(6) because it has been prepared in a proportionally-spaced typeface using Microsoft Word in 14-point Calisto MT. This brief complies with the electronic-filling requirements of Local Rule 28A(h)(2) because it was scanned for viruses and no virus was detected.

Dated: April 29, 2026

*/s/ Bonnie Keane DelGobbo*
Bonnie Keane DelGobbo

## Certificate of Service

I hereby certify that on April 29, 2026, the foregoing brief was filed with the Clerk of Court for the U.S. Court of Appeals for the Eighth Circuit through the CM/ECF system, which will send a notification of such filing to all counsel of record.

Dated: April 29, 2026

*/s/ Bonnie Keane DelGobbo*
Bonnie Keane DelGobbo